******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ALEXA PASCUAL ET AL. *v.* TAMMY K. PERRY
(AC 46674)

Alvord, Cradle and Vertefeuille, Js.

*Syllabus*

The plaintiffs appealed from the judgment of the trial court for the defendant on the count of her counterclaim alleging adverse possession of certain real property. They claimed, inter alia, that the court erroneously concluded that the defendant could tack the period of adverse possession of her predecessor in title, V, onto her own. *Held*:

The trial court's conclusion that the defendant's and V's exclusive maintenance of the disputed area was sufficient to satisfy the open and visible use element of adverse possession was not clearly erroneous.

The trial court's finding that V's possession of the disputed area was hostile was not clearly erroneous, as the court made its finding of hostile possession after properly considering and weighing all relevant evidence before it, including evidence allegedly demonstrating V's permissive use.

The trial court did not err in its conclusion that the defendant was entitled to tack V's period of adverse possession onto her own, as evidence in the record was sufficient to establish V's implied intent to transfer possession of the disputed area to the defendant.

This court declined to review the plaintiffs' inadequately briefed claim that the judgment of foreclosure rendered against the plaintiffs' predecessor in title interrupted the statutory period for adverse possession as a matter of law.

(*One judge dissenting*)

Argued September 16, 2024—officially released February 4, 2025

*Procedural History*

Action, inter alia, seeking to quiet title to certain real property, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the defendant filed a counterclaim; thereafter, the case was tried to the court, *Hon. John W. Pickard*, judge trial referee; judgment for the defendant on the complaint and in part on the counterclaim, from which the plaintiffs appealed to this court. *Affirmed.*

*Luis A. Medina*, for the appellants (plaintiffs).

*Stephanie M. Weaver*, for the appellee (defendant).

*Opinion*

CRADLE, J. The plaintiffs, Alexa Pascual and Freiny Francisco, appeal, following a trial to the court, from the judgment rendered in favor of the defendant, Tammy K. Perry, on the count of her counterclaim alleging adverse possession. On appeal, the plaintiffs claim that the court erroneously concluded that (1) the defendant's and her predecessor in title's use of the disputed area was open and visible; (2) the defendant's predecessor in title's possession of the disputed area was hostile; and (3) the defendant could tack her predecessor in title's period of adverse possession onto her own, and, additionally, (4) the court erred in failing to find that the defendant's adverse possession rights were extinguished by the judgment of foreclosure rendered against the plaintiffs' predecessor in title. We affirm the judgment of the trial court.

The following facts, as set forth by the trial court, and procedural history, are relevant to our resolution of the claims on appeal. The parties own adjoining residential properties in a subdivision in Torrington. The defendant owns the real property known as 53 Hartford Avenue, and the plaintiffs own the abutting property to the east known as 14 Albany Street.[1] The defendant purchased 53 Hartford Avenue on June 4, 2015, from Veta Pipa, who had owned the property since June 19, 1985. The plaintiffs purchased 14 Albany Street on October 22, 2015, from Hudson City Savings Bank, following a judgment of strict foreclosure rendered against the previous owner, Arshad Tarar.[2]

At some point during the spring of 2020, the plaintiffs hired a fencing company to install fencing along their

---

[1] The defendant's property is a corner lot with frontage on Hartford Avenue as well as Albany Street. The eastern boundary of her property, facing Albany Street, borders the western boundary of the plaintiffs' property.

[2] The court took judicial notice of the judgment of foreclosure, which was rendered on October 20, 2014, with an ejectment date of January 14, 2015.

southerly and westerly borders, and a dispute arose between the defendant and the plaintiffs regarding the shared boundary line between their properties. This resulted in the plaintiffs hiring David J. Little, a licensed land surveyor, who produced a survey which demonstrated that an approximately 925 square foot area (the disputed area) was within the plaintiffs' property. Thereafter, the plaintiffs brought this action against the defendant, seeking, inter alia, to quiet title to the disputed area in their favor. The defendant admitted in her answer that the disputed area was within the plaintiffs' deeded property[3] but counterclaimed, inter alia, that she had acquired title to the disputed area by virtue of adverse possession.

On June 21, 2023, following a trial, the court, *Hon. John W. Pickard*, judge trial referee, issued a memorandum of decision in which it found in favor of the defendant on the count of her counterclaim alleging adverse possession. The court found that "the current line of possession was created more than thirty-five years ago and has remained unchanged since that time. From June, 1985, to June, 2015, . . . Pipa believed that she owned the disputed area . . . and used it as her own. This care and use was to the exclusion of anyone else including the plaintiffs and all of the other owners of 14 Albany Street since June 19, 1985. The defendant continued to treat the disputed area in the same way as her predecessor [in title] . . . . The defendant is able to 'tack' . . . Pipa's thirty years of exclusive use of the disputed piece onto five more years of her own

---

[3] The defendant also hired a licensed land surveyor, David Zygmont, who produced a survey of the defendant's property. Zygmont's map showed the deeded property line to be in the same location as Little's map. Both maps were admitted as full exhibits, and both surveyors, testifying as experts at trial, indicated that their maps were based in part on a 1916 subdivision map showing the deeded property line to be a straight line. It was undisputed that the surveyors' maps accurately reflected the true boundary line between the parties' properties.

use. This creates an uninterrupted period of thirty-five years of exclusive use . . . ." The court therefore concluded that all of the elements of adverse possession had been met. Accordingly, the court entered judgment quieting title to the disputed area in favor of the defendant. This appeal followed.

Before addressing the merits of the plaintiffs' claims, we identify the legal principles relevant to an adverse possession claim. "[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his [or her] own and without the consent of the owner." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 581, 31 A.3d 1 (2011); see also General Statutes § 52-575 (a). "It is sufficient if there is an adverse possession continued uninterruptedly for fifteen years whether by one or more persons. . . . [T]he possession [however] must be connected and continuous . . . . If one party's period of use or possession is insufficient to satisfy the fifteen year requirement, that party may tack on the period of use or possession of someone who is in privity with the party, a relationship that may be established by showing a transfer of possession rights." (Citation omitted; internal quotation marks omitted.) *Supronowicz* v. *Eaton*, 224 Conn. App. 66, 75, 312 A.3d 100, cert. denied, 349 Conn. 904, 312 A.3d 1057 (2024).

"It is well established that one claiming title to real property by adverse possession must prove by clear and positive evidence each element of actual, open, notorious, hostile, continuous and exclusive possession for the full fifteen year statutory period." *Mulle* v. *McCauley*, 102 Conn. App. 803, 809, 927 A.2d 921, cert. denied, 284 Conn. 907, 931 A.2d 265 (2007). "A finding

of adverse possession is not to be made out by inference, but by clear and positive proof. . . . [C]lear and convincing proof . . . denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Emphasis omitted; internal quotation marks omitted.) *Lisiewski* v. *Seidel*, 95 Conn. App. 696, 712, 899 A.2d 59 (2006).

"Despite [this] exacting standard, our scope of review is limited. . . . Because adverse possession is a question of fact for the trier . . . the court's findings as to this claim are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Citation omitted; internal quotation marks omitted.) *Mulle* v. *McCauley*, supra, 102 Conn. App. 809. "The legal conclusions that the court drew from those facts are subject to plenary review." *Padula* v. *Arborio*, 219 Conn. App. 432, 459–60, 296 A.3d 276, cert. denied, 348 Conn. 903, 301 A.3d 528 (2023); see also *O'Connor* v. *Larocque*, supra, 302 Conn. 573 ("[I]t is the province of the trial court to find the facts upon which [such a] claim is based. Whether those

facts make out a case of adverse possession is a question of law reviewable by this court." (Internal quotation marks omitted.)). With these principles in mind, we address the plaintiffs' claims in turn.

I

We first address the plaintiffs' claim that the court erroneously concluded that the use of the disputed area by the defendant and her predecessor in title was open and visible in that the defendant failed to present evidence "demonstrat[ing] intrusive acts" that would have placed the plaintiffs or their predecessors in title on notice of the adverse possession.[4] We disagree.

"The legal significance of the open and visible element is not . . . an inquiry as to whether a record owner subjectively possessed an understanding that a claimant was attempting to claim the owner's property as his own. Rather, the open and visible element requires a fact finder to examine the extent and visibility of the claimant's use of the record owner's property so as to determine whether a reasonable owner would believe that the claimant was using that property as his or her own." *Schlichting* v. *Cotter*, 109 Conn. App. 361, 368, 952 A.2d 73, cert. denied, 289 Conn. 944, 959 A.2d 1009 (2008).

"This court previously has held . . . that a party's maintenance of a disputed area, including planting and maintaining vegetation, may demonstrate an open and visible use of that area. See, e.g., *Padula* v. *Arborio*, supra, 219 Conn. App. 460 (plaintiffs removed soil and grass, installed sprinkler system, laid down new sod,

---

[4] In accordance with our Supreme Court's precedent, we "may address the claims in whichever order most readily addresses the matter at hand." *State* v. *Annulli*, 309 Conn. 482, 492 n.6, 71 A.3d 530 (2013). Accordingly, although not the first claim raised in the plaintiffs' appellate brief, we address this claim first because the relevant factual background provides context necessary for the resolution of the plaintiffs' remaining claims.

dug out old tree and planted new trees, and replaced fence, among other things, in disputed area); *98 Lords Highway, LLC* v. *One Hundred Lords Highway, LLC*, 138 Conn. App. 776, 811, 54 A.3d 232 (2012) (party made permanent improvements on land, including cleaning area of underbrush, cutting some trees down, planting lawn, trees, and garden, and installing fence in disputed area); *Eberhart* v. *Meadow Haven, Inc.*, 111 Conn. App. 636, 642, 960 A.2d 1083 (2008) (plaintiffs planted and maintained hedges and trees and maintained lawn, among other things, in disputed area); *Schlichting* v. *Cotter*, [supra, 109 Conn. App. 367–69] (plaintiff pruned and removed trees, planted and maintained plants, removed poison ivy from trees and removed sumac from foliage, raked leaves, mowed, fertilized and maintained lawn, and planted, cultivated and maintained garden, among other things, in disputed area) . . . ."[5] *Viering* v. *Groton Long Point Assn., Inc.*, 223 Conn. App. 849, 875–76, 311 A.3d 215, cert. denied, 349 Conn. 901, 312 A.3d 586 (2024).

Here, the defendant presented at trial testimony from Joan Altschuler, Pipa's daughter; William Jacquemin, Pipa's landscaper from 1993 to 2015; and Glen Burger,

---

[5] The plaintiffs argue that the present case is distinguishable from the cases cited in *Viering* v. *Groton Long Point Assn., Inc.*, 223 Conn. App. 849, 311 A.3d 215, cert. denied, 349 Conn. 901, 312 A.3d 586 (2024), in that each of those cases "contained . . . intrusive acts, uses and/or activities that do not exist in this case" and, accordingly, assert that Pipa's use was not sufficiently open and visible because "[n]one of Pipa's activities created a permanent structure or improvement." Although this court has considered permanent alterations to disputed land as a factor demonstrating open and visible use, we have not held that such alterations, or the lack thereof, are dispositive in determining whether a claimant's use of disputed land is open and visible. Cf. *Viering* v. *Groton Long Point Assn., Inc.*, supra, 876 (claimants' use of land was not open and visible because, "[u]nlike in [cases where maintenance of disputed area was sufficient to support such a finding], the [claimants] in the present case did not themselves plant any of the vegetation . . . and they did not submit any evidence to demonstrate that they maintained the vegetation in a visible and apparent manner").

who owned the property bordering the southerly boundary of 53 Hartford Avenue from 1995 to 2021. The court found each witness' testimony to be "entirely credible" and, on the basis of their collective testimony, found the following facts.

The disputed area is "bounded on the west by the deeded boundary line between the [parties'] properties, and on the east by two straight lines which meet at the edge of a stockade fence." The stockade fence had been constructed on the plaintiffs' property by Benny Visconti, a previous owner of 14 Albany Street, prior to Pipa's purchase of 53 Hartford Avenue. This fence does not extend all the way to the northerly boundary abutting Albany Street, but, rather, it extends roughly to the rear wall of the plaintiffs' house, at which point it turns eastward "so as to enclose the backyard of the plaintiffs' property." The stockade fence also does not extend all the way to the southerly boundary of the plaintiffs' property, although the court found that, "during . . . Pipa's ownership, the fence extended farther south than it does at the moment, nearly to the southerly boundary of both properties." When Pipa purchased 53 Hartford Avenue in 1985, there was also a "V-shaped split rail fence" located on the northern boundary of the plaintiffs' property, which was "actually located on the shoulder of Albany Street but appears to be located at the corner of both properties. The plaintiff[s] replaced the split rail fence with [a] vinyl fence sometime after [they] bought the property. The entire fence is located approximately ten feet from the deeded boundary line. The sides of the fence form a 'V,' which is the corner of the disputed piece."

When Pipa purchased 53 Hartford Avenue in 1985, she planted flowers within the disputed area, which "continued for the entire time of her ownership."[6] There

---

[6] We further note that, at trial, the defendant admitted as full exhibits, inter alia, photographs of 53 Hartford Avenue dated 1992 and 2008, both of which showed different flower beds purportedly located within the disputed

was also a "grass lined drainage ditch" within the disputed area, "intended to drain water coming from the higher elevation of the plaintiffs' property away from the defendant's house," when Pipa purchased 53 Hartford Avenue. Pipa, her daughter, and her landscaper "regularly removed leaves from this ditch." At some point in 2013, after experiencing water in the basement of her home, Pipa hired a contractor to place gravel in the drainage ditch and install a "yard drain." "The evidence is not clear about the workings of the 'yard drain,' but the evidence is that there is no underground piping involved with the gravel ditch."

Between 1993 and 2015, Jacquemin "mowed the lawn, removed the leaves, and helped mulch the garden." When Pipa first hired Jacquemin and showed him the boundary lines of her property, "[h]er description included the disputed area, and [Jacquemin] used those boundaries of the disputed area as the limits of his maintenance. In accordance with his instructions from . . . Pipa, . . . Jacquemin always mowed the grass up to [the] stockade fence and up to a line marking the continuation of the fence in a northerly direction to the pavement of Albany Street at the intersection of [the] split rail fence . . . . He believed that . . . Pipa owned the disputed area and always maintained it as part of . . . Pipa's land." After the defendant purchased the property from Pipa in 2015, she continued to use and maintain the disputed area in the same manner as Pipa and, additionally, "expanded the size of the garden to include more of the disputed area devoted to vegetables . . . ."[7] "Between [October, 2015] and the spring of 2020, [the plaintiffs] never challenged the

area. When Altschuler was shown these photographs at trial, she identified the flower beds as belonging to Pipa.

[7] We note that the defendant's expansion of the garden occurred within the existing boundaries of the disputed area, as established by Pipa in 1985, and thus did not enlarge the size of the disputed area.

defendant's maintenance and use of the disputed area. Their inaction allowed the defendant to mow the grass, rake the leaves, work in the garden, clean the drainage ditch within the disputed area, and continue to treat the disputed area as her own."

On the basis of the foregoing, the court concluded that the exclusive maintenance of the disputed area by the defendant and her predecessor in title was sufficient to satisfy the open and visible use element of adverse possession. After reviewing the record, we conclude that the court properly relied on the evidence that Pipa or her landscaper, occasionally with the help of Pipa's daughter or neighbor, regularly and exclusively maintained the disputed area from 1985 to 2015. This maintenance included mowing, weed whacking, hedge trimming, fertilizing, mulching, planting and maintaining multiple flower gardens, blowing out the flower beds biannually, fall and spring clean-ups, cleaning out the drainage ditch, and, on at least one occasion, the removal of tree roots within the disputed area. Burger's testimony highlighted the visibility of these efforts, as he indicated that the disputed area was mowed weekly and that Pipa could be seen regularly cleaning out the drainage ditch as well as working in the flower beds "all the time." Accordingly, we conclude that the court's finding with respect to the open and visible use element of adverse possession was not clearly erroneous.

II

We next address the plaintiffs' claim that the court erroneously found that Pipa's possession of the disputed area was hostile.[8] The plaintiffs do not contend

---

[8] We note that the plaintiffs claim only that the court's finding of hostile possession was erroneous with respect to Pipa's possession of the disputed area and, accordingly, the plaintiffs do not challenge the court's finding of hostile possession with respect to the defendant's possession of the disputed area.

that Pipa had express permission to use the disputed area, but they argue that their predecessors in title, siblings Benny Visconti and Elise Visconti, had acquiesced to Pipa's use of the disputed area, thereby rendering such use permissive rather than hostile.[9] Specifically, the plaintiffs claim that the court's finding of hostile possession was erroneous in that the court "fail[ed] to consider" evidence allegedly demonstrating Pipa's permissive use. We are not persuaded.

"As a general proposition, to satisfy the hostility requirement of adverse possession, a claimant's possession of the disputed land, from its inception, must be without permission, license or consent of the owner and must continue to be so throughout the required fifteen year period. . . . The word hostile, as employed in the law of adverse possession, is a term of art; it does not, despite some troublesome early cases, imply animosity, ill will or bad faith. Nor is the claimant required to make express declarations of adverse intent during the possessory period. . . . Hostile possession can be understood as possession that is opposed and antagonistic to all other claims, and that conveys the clear message that the possessor intends to possess the land as his or her own." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Mulle* v. *McCauley*, supra, 102 Conn. App. 813–14.

"To establish that the claimant used the land under a claim of right, the intent of the possessor to use the property as his own must be shown. . . . [P]rior permission may undermine the existence of a claim of right [because] use of the land by the express or implied permission by the true owner is not adverse . . . ." (Citation omitted; internal quotation marks omitted.)

---

[9] The plaintiffs, quoting Black's Law Dictionary (7th Ed. 1999) p. 23, state in their brief that "[t]o 'acquiesce' is defined as 'to accept tacitly or passively; to give implied consent to (an act).' "

*Padula* v. *Arborio*, supra, 219 Conn. App. 448. Where there is no direct evidence of express permission or an express claim of right, "the character of the [use], whether adverse or permissive, can be determined as an inference[10] from the [circumstances] of the parties and the nature of the [use]. . . . A trier has a wide latitude in drawing an inference that a [use] was under a claim of right." (Citation omitted; footnote added; internal quotation marks omitted.) *Brander* v. *Stoddard*, 173 Conn. App. 730, 751, 164 A.3d 889, cert. denied, 327 Conn. 928, 171 A.3d 456 (2017).

In support of their claim, the plaintiffs highlight certain evidence presented at trial allegedly demonstrating that Pipa's use of the disputed area was permissive. Specifically, they claim that, "[u]nder the circumstances of [Benny] Visconti's handicap,[11] the fact that [the Viscontis] erected the stockade fence prior to Pipa's tenure, the fact that [the Viscontis] could not have built the stockade fence on the bank, the fact that [Altschuler testified that] Pipa was shown the iron boundary pins, together with the friendship between [Pipa and the Viscontis], shows [the Viscontis'] acquiescence" as to

---

[10] Although a finding of adverse possession must be made out by clear and positive proof rather than by inference; see *Lisiewski* v. *Seidel*, supra, 95 Conn. App. 712; this court has clarified that this principle is more accurately understood "to condemn only the use of *presumptions* to aid the proof of essential elements of a claim of adverse possession, not inferences." (Emphasis in original.) *Woycik* v. *Woycik*, 13 Conn. App. 518, 522, 537 A.2d 541 (1988). It does not mean that "facts proved to the satisfaction of the trier which logically and reasonably lead to the establishment of other facts—that is, inferences—may not aid in the proof of a claim of adverse possession. . . . [It] does not require that the proof establishing the claim be based entirely on direct evidence, as opposed to circumstantial evidence and the logical and reasonable inferences to be drawn therefrom. The law does not impose such a mental straitjacket on the trier of fact in an adverse possession case." (Citations omitted.) Id., 523–24. Accordingly, although "adverse possession is not to be presumed . . . [t]his does not mean . . . that inferences may not be properly used in such cases to support a finding of adverse possession by clear and positive proof." (Citation omitted.) Id., 524.

[11] The testimony at trial reflected that Benny had only one leg and was confined to a wheelchair.

Pipa's use of the disputed area. We disagree with the plaintiffs' claim that the court failed to consider this evidence, particularly where the trial court, in its memorandum of decision, expressly mentioned much of the evidence that the plaintiffs claimed it failed to consider, namely, that the stockade fence was erected prior to Pipa's ownership, that the fence was built along a rise in elevation on the plaintiffs' property, and that the Viscontis and Pipa were friendly with each other.[12]

Moreover, after our review of the record, we conclude that there was sufficient evidence to support the court's finding of hostile possession. At trial, the court was presented with testimony that Pipa, throughout the thirty years that she owned 53 Hartford Avenue, regularly and freely used the disputed area as if it were part of her deeded property. In addition, there was no evidence presented that any owner of 14 Albany Street, or anyone else, had objected to Pipa's use of the disputed area or had tried to enter or use the area themselves. See, e.g., *Mulle* v. *McCauley*, supra, 102 Conn. App. 816 (concluding that finding of hostile possession was not clearly erroneous where, despite familial relationship between parties, there was no evidence presented that anyone other than claimants had used or maintained disputed property during prior fifty years). The court also was presented with testimony that Jacquemin had never asked the owners of 14 Albany Street for permission to work on the disputed area, as he stated that he "had no need to" because Pipa had told

---

[12] Although the court in its memorandum of decision did not specifically mention Visconti's physical disability or Altschuler's testimony regarding the boundary pins, "[w]e cannot assume that the court's conclusions were reached without due weight having been given to the evidence presented and the facts found. . . . Unless the contrary appears, this court will assume that the court acted properly" in that it considered all the relevant evidence before it. (Internal quotation marks omitted.) *State* v. *Weathers*, 188 Conn. App. 600, 609 n.9, 205 A.3d 614 (2019), aff'd, 339 Conn. 187, 260 A.3d 440 (2021).

him that she owned the disputed area. See *Bennett* v. *Bowditch*, 163 Conn. App. 750, 756–57, 137 A.3d 81 (2016) (evidence of regular occupation, use, and improvement of disputed area without requesting consent or permission of record owner supported finding of hostile possession); cf. *Dowling* v. *Heirs of Bond*, 345 Conn. 119, 157–58, 282 A.3d 1201 (2022) (evidence that claimants sought record owner's endorsement to repair structure within disputed area, and lack of evidence that claimants had held themselves out as exclusive owners of disputed parcel, supported finding that claimants were not acting under claim of right).

Accordingly, it appears from the record before us that the court, rather than failing to consider evidence allegedly demonstrating Pipa's permissive use, made its finding of hostile possession after properly considering and weighing the relevant evidence before it.[13] Because there was sufficient evidence to support the court's finding, we conclude that it was not clearly erroneous.[14]

[13] The plaintiffs also argue that the court's finding was erroneous because there was no evidence of Pipa's clear repudiation of the Viscontis' permission to use the disputed area. In so arguing, the plaintiffs rely on this court's decision in *Brander* v. *Stoddard*, supra, 173 Conn. App. 746, in which we stated that, "[a]lthough possession that is originally permissive may become hostile, it does so only if [the permission] is clearly repudiated by the occupant. . . . Such repudiation must be shown by some clear, positive, and unequivocal act brought home to the owner or the use will be presumed to be permissive." (Citations omitted; internal quotation marks omitted.) The plaintiffs' reliance on *Brander*, however, is misplaced. A showing of clear repudiation is not necessary where, as we conclude from the record here, there was no finding that possession had ever been permissive.

[14] The plaintiffs further claim that the court's finding of adverse possession relied on improper inferences because, they argue, there was insufficient evidence that "Pipa's use was open, visible, [and] without permission for the statutory period." However, as set forth in parts I and II of this opinion, we conclude that there was sufficient evidence to support the court's finding that Pipa's use was open, visible, and without permission for the statutory period. Moreover, as stated herein, the court was not precluded from using any logical and reasonable inferences drawn therefrom in finding that the elements of adverse possession had been established. See footnote 10 of this opinion. Accordingly, we conclude that the plaintiffs' claim is without merit. Cf. *Lisiewski* v. *Seidel*, supra, 95 Conn. App. 711–12 (concluding that

## III

The plaintiffs next claim that, because there was insufficient evidence of Pipa's intent to convey the disputed area when she sold 53 Hartford Avenue to the defendant, the court erred in concluding that the defendant was able to tack Pipa's thirty years of adverse possession onto her own. We are not convinced.

We begin by setting forth the relevant legal principles. "If one party's period of use or possession is insufficient to satisfy the fifteen year requirement [for adverse possession], that party may tack on the period of use or possession of someone who is in privity with the party, a relationship that may be established by showing a transfer of possession rights." (Internal quotation marks omitted.) *Supronowicz* v. *Eaton*, supra, 224 Conn. App. 75. "Privity of estate is not necessary, but rather, privity of possession. . . . Doubtless the possession must be connected and continuous, so that the possession of the true owner shall not constructively intervene between them; but such continuity and connection may be effected by any conveyance agreement or understanding which has for its object a transfer of the rights of the possessor, or of his possession, and is accompanied by a transfer of possession in fact. . . . Privity of possession is defined as a continuity of actual possession, as between prior and present occupant, the possession of the latter succeeding the possession of the former under deed, grant, or other transfer or by operation of law." (Citation omitted; internal quotation marks omitted.) Id., 76. "The question, therefore, is [whether] a grantor intended to convey the disputed area to the grantee, thereby establishing the continuous connection between successive adverse claimants required

court improperly inferred that statutory period of adverse possession had been met where record contained *no evidence at all* with respect to duration of claimant's use of disputed area).

to find privity and tack the successive adverse uses." Id., 80.

"It is clear from our case law . . . that an express conveyance of the disputed area either orally or by deed is sufficient to establish that the grantor intended to convey the disputed area." (Citations omitted.) Id. However, this court recently held in *Supronowicz* v. *Eaton*, supra, 224 Conn. App. 80–81, that privity also exists where a grantor's intent to convey the disputed area can be established by implication. In *Supronowicz*, this court explained that "the doctrine which appears generally to prevail is that a transfer in fact of adverse possession, or the adverse possession and claim of an area not within the description of the deed or contract, will be effective for tacking purposes though the same appears to have occurred by implication only, by force of the circumstances and acts of the parties, and is not shown to have been evidenced by any declaration of transfer or other direct words." (Internal quotation marks omitted.) Id., 82. "Implication of a transfer of possession of the disputed area is most commonly found in two circumstances: (1) when the disputed area is enclosed within the deed described property or (2) when a building or other structure stands in part on the disputed area." (Footnote omitted.) Id., 83. Some courts also "have analogized natural boundaries to cases involving fences and have found an implied transfer on the basis of the existence of a natural boundary." Id., 85; see also id., 85–86 (reversing summary judgment denying plaintiffs' adverse possession claim on basis that, where disputed area was bound by ravine and creek, disputed area's enclosure by natural boundaries presented genuine issue of material fact as to whether privity existed). "Whether an implied transfer of [a] disputed area may be inferred from the evidence . . . raises a question of fact . . . ." Id., 85–86. "The legal conclusions that the court drew from those facts are

subject to plenary review." *Padula* v. *Arborio*, supra, 219 Conn. App. 459–60.

In the present case, the court concluded that the defendant was able to tack Pipa's period of possession onto her own. We agree with the plaintiffs that the record does not indicate that Pipa expressly conveyed the disputed area to the defendant.[15] On appeal, the plaintiffs acknowledge this court's holding in *Supronowicz*, but they assert that intent cannot be implied here because "there are no improvements or structures" within the disputed area. Even assuming this conclusory assertion to be legally accurate,[16] the plaintiffs do not address whether the disputed area was enclosed within the defendant's deed described property, thereby establishing Pipa's implied intent to transfer possession of the disputed area when she conveyed 53 Hartford Avenue to the defendant. We note that it is not contested that, at the time of Pipa's conveyance to the defendant, a portion of the disputed area was bordered by the stockade fence.[17] See *Supronowicz* v. *Eaton*, supra, 224

[15] The description of the property in the defendant's warranty deed, which she received pursuant to her purchase of 53 Hartford Avenue, references the 1916 subdivision map, which depicts the true boundary line between the properties. See footnote 3 of this opinion. Additionally, the defendant testified that she had never discussed nor had any direct communication with Pipa herself regarding the boundary line.

[16] We do not address the merits of this assertion and note only that the plaintiffs do not offer any legal analysis regarding whether the improved gravel drainage ditch, including the yard drain that Pipa hired a contractor to install, constitutes a "structure" for purposes of implying a predecessor in title's intent to convey a disputed area.

[17] The court further found "clear and convincing evidence that, during . . . Pipa's ownership, the [stockade] fence extended farther south than it does at this moment, nearly to the southerly boundary of both properties." Although the court did not expressly find that the fence extended farther south specifically at the time of Pipa's conveyance to the defendant on June 4, 2015, such a conclusion is supported by the testimony of Jacquemin, whom the court found "entirely credible." Specifically, Jacquemin testified that he maintained Pipa's lawn "all the way up [until] the house was sold" and that the stockade fence extended to the southern boundary of Pipa's property without any gaps.

We also note that, in addition to the stockade fence, there was a split rail fence at the northern boundary of the plaintiffs' property when Pipa con-

Conn. App. 83 n.12 (noting majority rule that "successive adverse possessions . . . of an area not within the description of the deed or contract but lying along and extending up to a fence apparently marking the boundary line between the land sold and neighboring land may be tacked upon the theory of an implied delivery of possession of such area" (internal quotation marks omitted)). We further note that, although the disputed area was not bound by an overt natural boundary such as a river or creek, the court found that the abutting stockade fence is "located at the top of a small rise in elevation," and, on our review of the record, it appears that this rise in elevation in fact abuts a substantial portion of the disputed area's eastern boundary.

Moreover, we reiterate that implied transference of a disputed area occurs "by force of the circumstances and *acts of the parties* . . . ." (Emphasis added; internal quotation marks omitted.) *Supronowicz* v. *Eaton*, supra, 224 Conn. App. 82. The court found, and the record supports, that, "[f]rom June, 1985, to June, 2015, . . . Pipa believed that she owned the disputed area." Accordingly, it is reasonable for the court to infer that Pipa intended to transfer possession of the disputed area to the defendant pursuant to the conveyance of 53 Hartford Avenue in June, 2015. See *Supronowicz* v. *Eaton*, supra, 85 (suggesting that predecessors in title's belief that they owned disputed area at time of conveyance is relevant to determination of whether there was

veyed 53 Hartford Avenue to the defendant. This fence was "actually located on the shoulder of Albany Street" and, therefore, did not border the disputed area. However, this fence "appear[ed] to be located at the corner of both properties" and "the sides of the fence form[ed] a 'V,' which is the corner of the disputed property." We note only that, although the stockade fence did not extend to the northern boundary of Pipa's property, the record indicates that Pipa used her property as if it did. Specifically, the court found that, "[i]n accordance with his instructions from . . . Pipa . . . Jacquemin always mowed the grass up to [the] stockade fence and up to a line marking the continuation of the fence in a northerly direction to the pavement of Albany Street at the intersection of [the] split rail fence."

implied transference of disputed area). In addition, having thoroughly reviewed the record, it appears to us that Pipa's actions consistently evinced her intent to transfer possession of the disputed area to the defendant pursuant to the conveyance of 53 Hartford Avenue. Specifically, the record reflects that, although Pipa sold the property to the defendant on June 4, 2015, Pipa had vacated the property and moved into a nearby apartment around the end of 2014. Even after Pipa left 53 Hartford Avenue, though, she continued to pay Jacquemin to maintain the disputed area in preparation of her selling the property, and she also returned weekly to maintain her flower beds which were found by the court to be within the disputed area. When Pipa subsequently listed the property for sale, the listing included several exterior photographs of the property which predominately featured the drainage ditch and other portions of the disputed area.[18] Additionally, pursuant to the sale of the property, Pipa provided to the defendant a Residential Property Condition Disclosure Report, wherein Pipa indicated that the improved drainage ditch, which sits entirely within the disputed area, was part of 53 Hartford Avenue.

We emphasize that, for purposes of the tacking doctrine, "[w]hether privity exists in cases of implied transference is inherently a fact dependent inquiry." Id., 85. On the basis of the foregoing, we cannot conclude that the court's determination that the defendant could avail herself of the tacking doctrine is legally incorrect or factually unsupported.

## IV

Finally, the plaintiffs claim on appeal that the court erred in failing to find that the judgment of foreclosure

---

[18] Altschuler testified that Pipa's real estate agent had taken the photographs but that Pipa personally approved each photograph to be included in the listing.

rendered against the plaintiffs' predecessor in title, as a matter of law and fact, interrupted the statutory period for adverse possession. The record, however, indicates that the plaintiffs did not raise this argument before the trial court, and, therefore, the court did not rule on this issue. It is well established that "[o]ur appellate courts, as a general practice, will not review claims made for the first time on appeal. . . . [A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court." (Citation omitted; internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–20, 99 A.3d 1079 (2014).

Moreover, we conclude that the plaintiffs, even had they preserved this issue for appeal, have abandoned the claim due to their failure to adequately brief the issue. "We are not required to review issues that have been improperly presented to this court through an inadequate brief . . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Michael T.*, 194 Conn. App. 598, 617, 222 A.3d 105 (2019), cert. denied, 335 Conn. 982, 242 A.3d 104 (2020).

On appeal, the plaintiffs summarily assert that "[a]n adverse possession claim can be extinguished by a judgment of foreclosure provided the parcels in dispute 'were the subject of [a] foreclosure proceeding.' " However, the case the plaintiffs quote, and the sole authority

on which the plaintiffs rely, *Wildwood Associates, Ltd.* v. *Esposito*, 211 Conn. 36, 557 A.2d 1241 (1989), does not support their conclusory assertion. In *Wildwood Associates, Ltd.*, because the court concluded that "the property in dispute was not included in the parcels that were the subject of . . . [the] foreclosure proceedings[s]," it never reached the issue of whether a judgment of foreclosure could extinguish vested adverse possession rights. Id., 47. Moreover, in the plaintiffs' fleeting discussion of the issue in their principal brief, they fail to explain with any specificity how the judgment of foreclosure itself had any effect on the defendant's vested adverse possession rights.[19] Accordingly, because the plaintiffs fail to advance a substantive legal or factual argument in support of this claim, we conclude that it is inadequately briefed. We therefore decline to review this abandoned claim.

The judgment is affirmed.

In this opinion, VERTEFEUILLE, J., concurred.

---

[19] Rather, the cursory arguments advanced therein appear to address whether the requisite time period for adverse possession had been met at all. Specifically, the plaintiffs argue that "[t]estimony and all evidence reveal [that] the time for adverse possession did not begin to run until the defendant disputed the boundary line in 2020" and that the court erred in finding that "the current line of possession was created more than thirty-five years ago" because "the record is devoid of when the statutory time should have commenced." Indeed, in their reply brief, the plaintiffs appear to reframe their claim as such, asserting only that the court erred in "finding that adverse possession was established before [the judgment] of foreclosure" rather than addressing the legal effect of the judgment itself. Even if we were to assume that the plaintiffs adequately briefed this reframed claim, however, we conclude that it is without merit. In parts I and II of this opinion, we conclude that there is sufficient evidence to support the court's finding that Pipa's use and possession of the disputed area, immediately on her purchase of 53 Hartford Avenue in 1985, satisfied the elements of adverse possession. Accordingly, the same evidence is inherently sufficient to support the court's conclusion that the statutory period commenced at that time.